Good morning, Your Honors. May it please the Court. My name is Philip Bartz. I represent the petitioner Daniel Oyeniran, and I would like to reserve four minutes of my time for rebuttal. I will try to keep track of that. Petitioner Mr. Oyeniran is a Nigerian citizen and importantly the son of a prominent Christian rights activist in Nigeria. As a Christian rights activist in a country with Sharia law, petitioner's father, Archbishop Oyeniran, has been subject to attack and torture, as that concept is used in the Convention Against Torture in Nigeria. As the archbishop's son, petitioner is the subject of the same type of torture in Nigeria, which is the genesis of this case. The primary issue in this case today concerns the propriety of the government's relitigation of events that occurred to petitioner's family in Nigeria in 2003 and 2004. Counsel, we really have two parts to that argument, don't we? The first part has to do with the 2005 hearing, and I gather you're arguing that there's collateral estoppel that applies there, and I probably agree with you about that. But as I understand it, you're also arguing that, as would typically be the case if there was a finding of torture in the past, there's a presumption of future torture. And that doesn't really apply in a deferral case, does it? A presumption, again, of future torture? Of future torture. Well, Your Honor, it — I don't — let me — let me qualify that. I don't think that's exactly right. I mean, it depends if there — it is a predictive exercise. And so if — Well, let me — let me be sure we're talking about the same thing here. Okay. In a normal situation where you would be talking about removal, that's one body of law. Yes. But in this case, your client, because of his criminal record, was given a deferral. Right. Which is something that can always be changed by the government. So I guess what I should perspective, what is the standard by which we view future possibilities? Assuming for a moment that we agree that the 2005 issues that are fall within the walls of the four elements for collateral estoppel are done. That has nothing to do, does it, with respect to the current situation and whether there is sufficient evidence that he will be subject  No, I think that's a fair question. I mean, I think the original findings provide a baseline for what we had as of whenever that decision was made. I mean, for example, to give a — I think trying to respond to your question, sometimes I'm a little obtuse, but I try. Like, for example, if after 2005 the Nigerian government changed, for example, say a Christian government swept into office and there was no more Sharia law or something like that. Well, if the government wanted to bring that up subsequently showing, you know, that country conditions have changed, yes, that would be subject to a new adjudication and possibly a different outcome. But two things occurred here that would go along the line that you're arguing. Number one, he went back to Nigeria, and obviously for a humanitarian purpose, to see his sick to me that the I.J. and the B.I.A. put weight on the testimony that they hadn't had before, and even if there had been some torture before, they didn't think it was necessarily at the hands or the knowledge of the government. So would you comment on those two points that could be argued as changed circumstances? Sure. I think importantly, again, we have the baseline finding, and so the question that you're, I think, asking is, is something different, or is there some new information that would change that? Again, information, you know, we, again, this is setting aside collateral estoppel, because evidence that existed at the time that could have been presented, there's no reason to revisit that. I would submit that that is not permissible. However, on this record, the visit in 2007, as the record shows, was utterly clandestine. He was in and out of the country. He was under protection the entire, literally the entire time except for the trips to the airport. With respect to his father's testimony What do you make, though, of the inferences that the immigration judge drew from the visit? Well, I'm not sure, again, respectfully, I'm not sure that under the Convention Against Torture some of those inferences make any difference. We don't remove people to countries if they can simply protect themselves with armed guards or an Uzi or whatever that might be. I mean, there's a suggestion of that in this record. It was never held, but I don't think that if that was the issue before the Court Well, the standard would be, is it more likely than not? Correct. It was more likely than not, but I don't think we send people to countries where it's more likely than not they would be tortured, but they might be able to defend themselves somehow with armed guards or Secret Service protection or something like that. So I don't really think that matters. I mean, I think on the second point, the Archbishop's testimony, I think it's critically important that the Board of Immigration Appeals found that when it reversed the immigration judge's credibility finding, it implicitly found, if not explicitly, that the Archbishop's testimony was consistent with his son's testimony. And in fact, if you look at his testimony, it's a little hard to read in the transcript, but the fact is he actually added more detail to the attacks that occurred in 2003. He specifically explained that the attackers who attacked Archbishop Oyenaran and his son Benga, who is the petitioner's brother, it actually showed that there were Sharia police uniforms they were wearing. They were brown Sharia police. That detail wasn't in the original 2005 record. So what we have is new testimony, but the testimony is cumulative. Counsel, what's your position about what we should be doing here? Obviously the IJ took some testimony about these new things, not so much about the warrant, the Sharia warrant, which is yet another new item. But clearly the IJ did not apply the collateral estoppel standard. So let's assume, arguendo, that that was the correct standard. What are we to do? Are we to send this back, remand it back to the BIA to send it back to the IJ to start a new hearing with a baseline of these facts that were collaterally estopped and then move forward from there? Is that what we're supposed to do? Well, in a standard case, an agency case, that would be the normal thing to do, to send it back down for further proceedings consistent with what your opinion is. I would respectfully submit that this is one of those unique cases where we have this record. To send it back would be futile, I believe, with any other direction than to grant Mr. Ollantaran deferral of removal. I don't think any reasonable fact finder, and that's the standard that applies, could possibly take this record and conclude that he's not entitled to... But counsel, I guess what I'm struggling with, I get your point about the futility of it, but the reality is the IJ, if you're correct in your argument, applied the wrong standard. So the baseline from which the IJ starts and going forward is faulty. So how do you build on a faulty foundation that's almost biblical? Well, no, I think you're right. I mean, it is a faulty foundation. And as we explained, the only thing they should have properly looked at outside of collateral estoppel would have been any new evidence that they had. And so, yes, the... And then in most cases, as the Supreme Court has told the Ninth Circuit more than once, we're supposed to send it back, not become the BIA, correct? That is correct. And, you know, I used to be on the other side. I used to be the Deputy Assistant Attorney General for oil. So I know how that goes. So, yes, I mean, I'm not going to tell you that's not what you typically do. But in this case, if it were to go back, the other motion that you have, the motion to reopen would then take on some significance, correct? Yes, I believe if it was sent back down and there was a new proceeding, this evidence, you know, it would be something new. So we're not trying to reopen. It is reopened. And that evidence could come in. And obviously, that evidence to be... Well, can I stop you there just procedurally? If it were to go back, is it your view that it would be premature or moot for us to rule on the appeal on the motion to reopen? No. I mean, I think it should be ruled upon. But if it goes back down, my understanding would be, I mean, I think we would be able to get that evidence in if the proceeding has to be reopened. I mean, the fact of the matter is, is that if that evidence, right now, there's a final decision here, and that evidence wasn't allowed in, and we're saying that's error to affirm with that evidence out there, that the motion to reopen should have been granted because it was an abuse of discretion, because the two explanations that the board gave are simply wrong. I mean, with all due respect to the government, but... So it's not moot even if we rule your way on the collateral estoppel issue? Yes. I think that's right. Did you want to save the remaining time for rebuttal? That would be great. Thank you, Your Honors. Thank you. Good morning, Your Honors. Tai O'Toon on behalf of the Attorney General, Eric Holder. With the Court's permission, I'll be addressing three issues this morning. The first is that collateral estoppel does not apply, because although the facts are similar, they are not virtually identical, comparing the 2005 proceedings to the 2009 proceedings. And the second issue will be that there is substantial evidence in the record showing that the board properly determined that the petitioner was ineligible for deferral of removal because he has not been able to show that there was any acquiescence of a public official, and because any of the harm that occurred did not rise to the level of torture. And the third issue is that there is no abuse of discretion regarding the board's denial of the petitioner's motion to reopen. Counsel, I'm concerned about this matter of the restaurant. Yes. And I'd like to – I'd just like to refresh our – both of our recollections as to what that restaurant arrests for, what is the charge. And it says – and this is issued by the Nigerian government, the Sharia area. Actually, if I may just correct you, Your Honor. It's a governmental document, isn't it? Yes. Private parties can't issue arrest warrants. That's correct. It's a government document. That's correct. Okay. So it says that the charge is, engage yourself and others at large in inciting and the spreading and propagation of Sharia laws and traditions. And this is not a street crime that they're trying – not rape, robbery, murder. It's nothing like that. No. See, it's not a street crime. It's a – it's sort of a political crime, isn't it? That's correct. I just – Now, here's my question, though. The – the declaration was filed by Mr. Ollinarian, and Mr. Ollinarian explained why he wasn't able to bring that warrant evidence in front of the immigration judge. He explained why that was so, and your – you, the Board of Immigration Appeals, found him credible in that hearing, didn't you? Yes, Your Honor. Well, then, when you find him credible in that and he explains that he really didn't have a fair opportunity to bring that warrant, he didn't even know about it until a year after the hearing. And for good reason. He'd been in custody for three years under the federal government. So I'm just curious, what is there – you found in your order that that wouldn't have changed the result? In any event, you said he waived it because he didn't diligently bring it before the immigration judge. But in any event, even if he had, it wouldn't change the result. And here's my question. You have to explain to me why that wouldn't change the result. It seems to me like it's the elephant in the room. Yes, Your Honor. I just wanted to draw your attention to the fact that the warrant is issued by the Supreme Magistrate Court of Nigeria, not by the Sharia police. You mentioned that it was issued by the Sharia police and petitioners claiming that it was issued by the Sharia police. It's actually issued by the Supreme Magistrate Court of Nigeria located in Lagos State. But it was to enforce Sharia law, was it not? It's – yes, it is charging the petitioner with inciting and challenging Sharia law. What's the difference except the government is integrally involved and cooperative with the Sharia court? Say Sharia or Sharia? Sharia. I guess it goes either way. Oh, I know it would, but I just want to know the correct way to pronounce it, if you know. I pronounce it Sharia law. But doesn't Judge Smith's point really go to your second point? You were going to say that the Sharia law is not an act of acquiescence or involvement, and now we have this piece of paper. Now, we don't know what it is or does or says yet, but isn't that enough to say we ought to find out? Well, Your Honor, the warrant actually doesn't state any dates for this alleged activity. The respondent – the petitioner has been in the United States since 1988. He returned to Nigeria for a two-week period in 1998, and he returned for a five-week – for a period of 2005 to visit his mother when he was allegedly in the hospital. No one knew when he was there, so I'm not quite sure what period of time the petitioner is claiming he was inciting. He's not claiming he was inciting anything. He's claiming that the government has charged him, and so your arguments really go to the details rather than – in fact, wouldn't they go more to the weight that the I.J. may give to it and what texture it is rather than this is pretty much of a bombshell to have him charged by the time that he's gone back? That's correct. Your Honor, let me just point you to the standard for motions to reopen. The regulation, which might be found in 8 CFR 1003.2C1, states that motions to reopen are based on facts that were not previously available, could not be discovered, or presented. And in this case, the warrant was issued by the Supreme Magistrate Court of Nigeria on May 28, 2008. This is while the petitioner's proceedings were ongoing. The immigration judge didn't make a decision until June 1, 2009. Okay, so here's – can I stop you there? Because I kept reading your brief, and tell me if I read this right. Your brief basically says the warrant was issued, therefore he must have or should have known about it. That's because the standard of proof for motions to reopen is that the facts were previously unavailable, could not have been discovered, or presented. Well, let me ask you, where is there any evidence that a warrant that was issued in Nigeria that he would have gotten notation of it? Even if he didn't get it immediately, are you suggesting they would have sent it courier expressed to the immigration detention in the United States? Well, Your Honor, while that's possible, considering the petitioner's father knew he was in proceedings, his father had come to testify. But I'm not even going that far. But what – he says, I didn't get it. He's been incarcerated during that period. Right. Hasn't he made a threshold showing, or are you saying that he doesn't meet the standard and the regulation? That's exactly my point, Your Honor. The standard for motions to reopen are facts that were previously unavailable, not discoverable, could not be presented. He's not even aware of it. Awareness is not an element of the regulation. If that were the case, a petitioner or an alien could simply bury their head underneath the sand and claim that they have a warrant. Let's say there's a warrant out there for your arrest right now, and mine too. Would we be charged with knowledge of that if we didn't have any idea that there was a warrant out? Well, Your Honor, if I might respectfully disagree with you, that's not focusing on the standard, which in this case is that the facts were available, could have been discovered or presented, not that an individual is aware of that. Well, let me just stop you there. You can keep saying the standard, but what does it mean in practice? So does that mean that he should say, hmm, I wonder if the Nigerian government has a warrant out against me, they better go do what is unavailable in Nigeria, Freedom of Information Act requests. Or I might go down and ask them, do you have a warrant out against me? In other words, what is his avenue for should have known or should have discovered? To my knowledge, there are not any cases specifically dealing with awareness of issues like this. How about as a practical matter? But I would say that reasonably, considering that, I mean, he was detained for a period of time by the Department of Homeland Security, but he wasn't denied a telephone. He was in communication with his father. He was in communication with his family. He was able to, while he was detained, contact his father, who traveled all the way to the U.S. to testify on his behalf. He was able to hire and retain an expert witness who came to testify on his behalf. One would think that if this is a piece of evidence that conclusively shows that it's more likely or not that he would be tortured in Nigeria, this is a piece of evidence that his family members or that the petitioner that would substantiate the government's position under the facts or something similar to what's alleged here. Not that I'm aware of. I'm not either. It seems to me the government's engaging in a bit of a fantasy here. This man who is detained is supposed to know that there's a warrant issued for him in Nigeria. How can you say that? I mean, it's just, it's almost ludicrous. Well, Your Honor, if I might just point you to another issue, this might help to answer the question. Petitioner's claim is based solely on his father's religious and political activities in Nigeria. And although the petitioner is submitting a warrant for his arrest, he's never submitted a warrant for his father's arrest or submitted any evidence, sorry, that his father has been issued a warrant or any similar. Let's go to that point because that deals with the collateral estoppel issue. In 2005, the immigration judge found that there was evidence of prior torture of his immediate family sufficient that he said he believed him. And if that's true, and if collateral estoppel's involved, then it changes the whole position of the government on this, doesn't it? I mean, your basic underpinning is undone. Isn't that correct? That's correct. But collateral estoppel doesn't apply in every... Well, let's talk about that. Yes, Your Honor. What about Utah Construction and Mining Company from the Supreme Court? What about our case of Enrique Fedorenko? Yes. The CIA case, excuse me. Yes, so that's a seminal board decision focusing on collateral estoppel, which it does state in that decision, collateral estoppel applies in immigration cases. So what we're really talking about here, then, is whether the four elements that the Supreme Court set out in Utah Construction have been met here. Isn't that correct? That's correct. But the one very important distinction is that, or the two very important distinctions is that they do not arise from virtually identical facts. The facts are similar but not virtually identical because a key distinction, as Honorable McKean pointed out, is that the petitioner returned to Nigeria safely. He remained in Nigeria for a period of 34 days unharmed. That's afterwards. That's after, which is why, which is one reason why the facts aren't similar. Forgive me, counsel. I'll give you a little lesson in advocacy. Don't talk when a judge is talking. Yes. Okay? Don't do that. You keep doing it with Judge McKeown, you keep doing it with me. I apologize. Listen to the question. Answer the question, okay? Now, what we've got here is a ruling after 2005. There's no question that the IJ could not have found what happened after 2005 at the time the ruling was made to which the collateral estoppel might apply. So my question to you is, given the four elements of Utah Construction, given what happened in the finding there, aren't those findings binding upon the government? No, Your Honor. Why? Why? Because, one, the facts were not virtually identical. Why? Why is that? The facts were not virtually identical because in 2009, when the immigration judge had a de novo determination about the petitioner's eligibility for deferral of removal, a very important fact that was in the record that wasn't there before was the fact the petitioner had returned to Nigeria. Okay, so stop. So you have to just stop there. Sorry. What fact changed about whether the father had been assaulted and tortured in the 2003 and 2004 period? Were there any facts that changed about that that were material? Well, there are. That calls for a yes or no, and then if the answer is yes, then you can explain it. Yes, there were additional facts. What were the additional facts as to the torture that would change, that would permit the IJ to basically flip-swap in the determination? So the additional facts that were in the record were when the petitioner's father testified, he testified to additional details such as the, he claimed that the identities of the individuals who attacked him, the, and He made his case better, not worse, right, if anything? Well, that's to say that I mean, they were virtually identical facts. In other words, it's like saying was if the IJ had determined on a certain date that the light was red, and there were no other facts to say it was green, and two years later say, well, you know, the light was green. There's just an, here there's such an absolute reversal of the view, and certainly the IJ's reversal of the view about that torture couldn't have been predicated on his returning to Nigeria. That's a whole separate issue, isn't it? Well, just, I forgot to mention also that additional details were that the petitioner's father also testified not to say his security detail, and he also testified, there's evidence in the record that since the prior hearing, there had been no additional threats, no additional incidents of harm or torture to the petitioner. And if there was nothing further, does that make the thing in the past somehow get erased? Well, not erased, Judge, but the explicit language of the regulation, which is the deferral of removal regulation, which can be found at 8 CFR 1208.16a2 states that the Department of Homeland Security may move the immigration judge to terminate deferral of removal and have a de novo determination based on But counsel, forgive me, you're just skipping all over the place here. Judge McEwen is trying to ask you about the elements of collateral estoppel. The whole point of collateral estoppel is that there are certain things that were found as of 2005, and that what was testified to later may have some bearing on the continuation of the deferral, but it has nothing to do with whether there was collateral estoppel in 2005. I mean, the fact that the father testified again, the fact that he went to Nigeria, all of those things may bear on deferral. They may bear on some other element that may come up, but it has nothing to do with the application of collateral estoppel. I ask you whether collateral estoppel applies. You said no. Judge McEwen starts to go down things that were proven, and you're going off on what happened in the future after 2005. That doesn't address the collateral estoppel. Well, that's because I went off on that avenue, Your Honor, because that's what the language of the deferral of removal regulation. It asks the judge to have a de novo determination based on the prior proceedings. That would have been the 2005 proceedings plus any new additional evidence that's in the record. It may be a small wrinkle, but the statute you're referring to talks to a termination of a grant of deferral, and we're not in that procedural posture here, are we? I'm sorry? We're not in that procedural posture. In fact, the government dropped that whole... Oh, no, the government didn't. The government absolutely didn't. The Department of Home Security moved the immigration judge. There was actually a hearing to terminate the petitioner's deferral of removal, and at the end of that hearing, after reviewing the 2005 proceedings and after reviewing the new evidence in the record, the immigration judge then determined that the petitioner was ineligible for asylum, so she did follow the regulations by reviewing the entire record. Thank you. Just three quick points to answer some of the questions that you were making. First, with respect to Judge Brewster's question, when a motion to reopen is filed with an affidavit from the petitioner, this Court has made absolutely clear that no credibility determinations are supposed to take place. They're supposed to be accepted as true, and it's particularly apt here, as you pointed out, since he was found credible by the board. So the law, and the case is Basin v. Gonzalez, explicitly says the government is not allowed to make a credibility determination. So you're absolutely right. They can't do that. On top of that, and I don't want to pile on, but these are all post hoc justifications. They can't come in here today and say, well, gee, we don't think he's credible. He should have known about this. I mean, the board didn't say that. The board doesn't say anything. So that just doesn't cut it, and it was plainly arbitrary and capricious and just error not to allow the reopening on the grounds that they gave, which they weren't even grounds. They were simply statements. And the board's determination was wholly on the reopening issue, right? There was nothing else in it. Correct. The second thing is, on your question of collateral estoppel, you're right. Utah Construction, United States v. Montana, they have an argument in their brief that she alluded to that the facts have to be identical. That's not what the four elements require. This case is so much in the sweet spot of sweet spots on collateral estoppel. This is collateral estoppel 101. I mean, it's the same parties. There's no, like, you know, a Park Lane question about offensive use of collateral estoppel. It's the same. It's the exact same issues. Everything's exactly the same. So, no, I mean, I leave that there. But those are the criteria, and we meet those criteria. Finally, you're right on your question, Judge McKeown. This is not a deferral case. I don't, I mean, excuse me, this is not a termination of deferral case. The government abandoned that below. They originally did it as a termination of deferral in 2008, and they said, oh, no, no, no, no, that's the wrong procedure. We're abandoning that, and we're going to start new proceedings. So, for them, I mean, at the end of the day, I don't think it matters. But for them to suggest that those regulations apply, this is not a termination case at this point. That's all I have, unless you have any questions, which I'm happy to answer. Nope. Thank you. I'd like to thank both counsel for your argument. O'Yearian v. Holder is submitted. I also note that, Mr. Bartsch, you're here as pro bono counsel. Yes. And the Ninth Circuit has a pro bono counsel program for particularly in the immigration area, and we appreciate having briefed cases by counsel. I know, also, that the government appreciates it because it is often easier to respond as well. So I thank you for your pro bono assistance, and also thank you, Mr. Tunia, for coming all the way to San Diego. The case is submitted. Next case for argument, Moenge v. Maya Magazines.
judges: Brewster, McKeown, Smith